# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | | |
|---|---|---|
| **ALFRED MERCER** | * | **CIVIL ACTION NO.  11-0372** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **LIFE INSURANCE COMPANY OF NORTH AMERICA** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned magistrate judge, on reference from the district court, are cross-motions for summary judgment filed by plaintiff Alfred Mercer [doc. # 24] and defendant Life Insurance Company of North America ("LINA") [doc. # 28].  For reasons explained below, it is recommended that LINA's motion be denied, and that plaintiff's motion be denied in part and granted in part.

On March 8, 2011, Alfred Mercer filed the instant complaint under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*., against LINA, the designated plan fiduciary for the employee welfare benefit plan ("the Plan") sponsored by Mercer's former employer, Lakeland Holdings, LLC, d/b/a WorldStrides.  *See* Compl.; Amend. Rider; Admin. Record, Bates Labeled MERCER00240-241.  Plaintiff contends that LINA wrongfully denied him disability benefits under the Plan.  (Compl.).  Accordingly, he seeks a judgment ordering LINA to pay him disability benefits under the Plan, plus attorney's fees.  *Id.*

Following the resolution of cross-motions for summary judgment regarding the standard of review to be applied in this case,[1] the court set a briefing schedule for submission of the matter

---

[1] *See* discussion, *infra*.

for decision on the administrative record, as supplemented.  (Sept. 22, 2011, ERISA Briefing Order [doc. # 23]).  Instead, however, the parties submitted the matter for decision in the context of cross-motions for summary judgment [doc. #s 24 & 28], thereby effectively conceding that there are no genuine issues of material fact.[2]  Following delays for responsive briefs, the matter is now before the court.

### Summary Judgment Principles

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2511 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.  *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247).  "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by

---

[2]  Plaintiff's motion is entitled "Motion for Summary Judgment Regarding the Standard of Review."  It includes a memorandum on the scope of review and a separate "Memorandum," that addresses the merits of the complaint.  It appears that plaintiff inadvertently re-filed a copy of his prior motion for summary judgment, together with his memorandum on the merits.  To the extent that the submission was intentional, however, the court declines to re-visit the standard of review, especially given the proposed outcome of this case, utilizing the current standard.

pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate.  *Id*.

In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor.  *Anderson*, 477 U.S. at 255.  "The court *need* consider only the cited materials, but it *may* consider other materials in the record."  Fed.R.Civ.P. 56(c)(3) (emphasis added).  While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  There can be no genuine issue as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322-23.  This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id*. at 323.

When a movant bears the burden of proof on an issue, it must establish "beyond peradventure[3] all of the essential elements of the claim . . . to warrant judgment in [its] favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  In other words, the movant must affirmatively establish its right to prevail as a matter of law.  *Universal Sav. Ass'n v. McConnell*, 1993 WL 560271 (5th Cir. Dec. 29, 1993) (unpubl.).

---

[3] *I.e.*, beyond doubt.

3

**Relevant Facts**

**A.      The Group Insurance Policy**

LINA issued Group Policy Number LK-961394 (a/k/a the "Plan") to Lakeland Tours,

LLC d/b/a WorldStrides ("WorldStrides"), which provided WorldStrides' employees with long

term disability insurance coverage.[4]  Through his employment as a programmer-analyst at

WorldStrides, plaintiff Alfred Mercer was a Class 2 participant under the Policy.

(MERCER00167).  LINA administers claims under the Plan and pays those claims from its own

funds.  (Interr. Resp.; Pl. MSJ, Exh.).

Relevant Plan provisions include,

**Disability Benefits**

The Insurance Company will pay Disability Benefits if an Employee becomes
Disabled while covered under this Policy.  The Employee must satisfy the
Elimination Period, be under the Appropriate Care of a Physician, and meet all the
other terms and conditions of the Policy.  He or she must provide the Insurance
Company, at his or her own expense, satisfactory proof of Disability before
benefits will be paid . . .

**Elimination Period**

The Elimination Period is the period of time an Employee must be continuously
Disabled before Disability Benefits are payable.  The Elimination Period is shown
in the Schedule of Benefits . . .

                              *              *              *

**Definition of Disability/Disabled**

The Employee is considered Disabled if, solely because of Injury or Sickness, he
or she is:

---

[4]  The administrative record is filed in the court record as document # 10, and Bates
labeled "MERCER00001-MERCER00533."  A copy of the Plan is numbered MERCER00215-
00243.  Hereinafter, citations to the administrative record will be limited to the applicable Bates
Number(s) for each cited document.

1.      unable to perform the material duties of his or her Regular
        Occupation; and

2.      unable to earn 80% or more of his or her Indexed Earnings from
        working in his or her Regular Occupation.

After Disability Benefits have been payable for 36 months, the Employee is
considered Disabled if, solely due to Injury or Sickness, he or she is:

1.      unable to perform the material duties of any occupation for which
        he or she is, or may reasonably become, qualified based on
        education, training or experience; and

2.      unable to earn 80% or more of his or her Indexed Earnings . . .

                        *               *               *

The Employee's ability to work is based on the following:
1.      medical evidence submitted by the Employee;
2.      Consultation with the Employee's Physician; and
3.      evaluation of the Employee's ability to work by not more than
        three Independent Experts if required by the Insurance Company . .
        .

The Independent Expert must be:
1.      licensed, registered or certified as required by the laws of the state in which the
        evaluation is made; and
2.      acting within the scope of that license, registration or certificate.

                        *               *               *

**Regular Occupation**
The occupation the Employee routinely performs at the time the Disability begins.
In evaluating the Disability, the Insurance Company will consider the duties of the
occupation as it is normally performed in the general labor market in the national
economy.  It is not work tasks that are performed for a specific employer or at a
specific location.

                        *               *               *

**Other Income Benefits**
An Employee for whom Disability Benefits are payable under this Policy may be
eligible for benefits from Other Income Benefits.  If so, the Insurance Company
may reduce the Disability Benefits by the amount of such Other Income Benefits.

5

Other Income Benefits include: . . .

2.      Any Social Security disability or retirement benefits the Employee
        or any third party receives (or is assumed to receive) . . .

*               *               *

*Social Security Assistance*
The Insurance Company may help the Employee in applying for Social Security
Disability Income (SSDI) Benefits, and may require the Employee to file an
appeal if it beliefs a reversal of a prior decision is possible.

The Insurance Company will reduce Disability Benefits by the amount it estimates
the Employee will receive, if the Employee refuses to cooperate with or
participate in the Social Security Assistance Program.

*               *               *

**Limited Benefit Periods**
The Insurance Company will pay Disability Benefits on a limited basis during an
Employee's lifetime for a Disability caused by, or contributed to by, any one or
more of the following conditions.  Once 24 monthly Disability Benefits have been
paid, no further benefits will be paid for any of the following conditions.

1)      Alcoholism
2)      Anxiety disorders
3)      Delusional (paranoid) disorders
4)      Depressive disorders
5)      Drug addiction or abuse
6)      Eating disorders
7)      Mental illness
8)      Somatoform disorders (psychosomatic illness)
(MERCER00215-00243).

Thus, under the foregoing plan terms, a claimant must be continuously "disabled" for a

90 day "Elimination Period" before disability benefits become payable.

(MERCER00222;00227).

After a claimant has received 36 months of LTD benefits, the definition of "disabled"

under the Plan becomes more restrictive.  The first 36 months of LTD benefits are payable under

the Plan if the claimant provides satisfactory proof that he is disabled from performing the

6

material duties of his regular occupation (commonly referred to as the "Own Occupation

Period").  Thereafter, the claimant will be "disabled" and, thus, entitled to continue to receive

LTD benefits, only if he is unable to perform the material duties of any occupation for which he

may reasonably become qualified (commonly referred to as the "Any Occupation Period").

**B.    Solely the "Own Occupation Period" is at Issue at this Time**

Mercer alleges disability as of December 17, 2009.  (MERCER00530).  Thus, plaintiff's

"benefit start date" following the 90 day "Elimination Period" was March 16, 2010.

(MERCER00005).  Thus, the "Own Occupation" period for the instant claim extends through

March 16, 2013, and is the sole period of disability is at issue herein.  Mercer's monthly benefit

under the Plan, at least prior to any Social Security Disability offset, was $3,423.00.

(MERCER00100-00101).

**C.    Plaintiff's "Regular Occupation"**

The administrative record contains various pieces of evidence that address plaintiff's

regular occupation.  For instance, plaintiff's employer listed plaintiff's job as "Computer

Programmer," and indicated that he spent 100 percent of his time sitting.  (MERCER00511).  His

employer further indicated that Mercer had been terminated because of his poor health.  *Id*.  On

the Report of Claim form, Mercer identified his job as Sr. Programmer Analyst.

(MERCER00531).

The record includes an excerpt from the Dictionary of Occupational Titles ("DOT") for

the position of Programmer-Analyst, DOT Code 030.162-014.   (MERCER00445-00447).

According to the DOT, a Programmer-analyst "[p]lans, develops, tests, and documents computer

programs, applying knowledge of programming techniques and computer systems . . ." in

seventeen task areas.  *Id*.  The strength requirements for the position are described as

"[s]edentary Lifting, Carrying, Pushing, Pulling 10 Lbs. Occasionally.  Mostly sitting, may

involve standing or walking for brief periods of time."  *Id*.

The record also contains a job description for the position of "computer programmer" that

is attached to the Functional Capacity Evaluation Summary completed by Steve Allison, P.T.

*See* MERCER00330-00344.  The attached information indicates that the job is performed at the

sedentary strength level.  *Id*.  Moreover,

> [p]rogrammers spend the majority of their time in front of a computer terminal,
> and work in clean, comfortable offices.  Telecommuting is becoming more
> common, however, as technological advances allow more work to be done from
> remote locations. . . . Like other workers who spend long period in front of a
> computer terminal typing at a keyboard, programmers are susceptible to eyestrain,
> back discomfort, and hand and wrist problems such as carpal tunnel syndrome.

(MERCER00341).

Following his one-day functional capacity evaluation, Allison opined that Mercer demonstrated

objective evidence of physical impairments and functional limitations that significantly limited

Mercer's ability to return to any past relevant work.  (MERCER00332).

On September 24, 2010, at his attorney's behest, Mercer was evaluated by Richard

Galloway, M.S.W., Ph.D., a licensed rehabilitation counselor.  (MERCER00317-0322).  In his

ensuing report, Galloway recounted Mercer's work history and noted that for the last 2 ½ years

that Mercer worked, he was "wheelchair bound due to knee and back problems."

(MERCER00319).  Galloway summed up, as follows,

> [i]n essence, his skills would be that of analyzing data processing requirement to
> plan data processing systems that will provide system capabilities required for
> projected work loads and plans layout installation of new systems or modification
> of existing systems.  Such work is considered to be skilled work and is generally
> performed in a sedentary position.  As a result of his past work activity, he has
> considerable skills in the operation, maintenance and use of computers and these
> skills could easily be transferred to other work activities.  However at the present
> time, based on my review of the medical information, any attempts at helping him
> secure employment or to participate in any on-going vocational rehabilitation

8

would need to be deferred and this will probably be the case in the future.  The functional capacity evaluation that was done by Mr. Allison for the Veterans Administration clearly indicates that Mr. Mercer could not sustain work on an 8-hour a day basis, day-in and day-out.

*Id*.

The record also reveals that because of his poor health, Mercer had worked from home since October 2008.  (MERCER00500, 00502).

### D. Factual and Procedural Background

#### 1. *Plaintiff's claim and LINA's initial denial*

On December 18, 2009, Mercer submitted a telephonic claim for LTD benefits. (MERCER00530-00533).  Plaintiff described his condition as "Herniated Disc-Back" and listed his last day worked as December 16, 2009.  He indicated that his treating physician was Dr. John Carpenter (a general practitioner).

In reviewing Mercer's claim, LINA obtained medical records from Dr. Carpenter; a November 10, 2009, MRI report from Martha Jefferson Hospital; physical therapy notes from Augusta Physical Therapy from September 22, 2009 to November 6, 2009; and medical records from the Harrisonburg VA Outpatient Clinic from January 8, 2010 to January 27, 2010.

#### a. Dr. Carpenter's notes

Dr. Carpenter's notes from November 15, 2008, indicate that plaintiff recently had started methadone treatment for his chronic pain.  (MERCER00431).  He had worked up to 5 mg., twice per day, with a little bit of sedation, but it was helping his pain.  *Id*.

On December 16, 2008, plaintiff's low back pain was under fair control, but he was experiencing some side effects, such as sedation and decreased concentration.  (MERCER 00432).

On January 20, 2009, Mercer had an emotional breakdown because of stress of work and the stress of grieving the anniversary of his parents' loss. (MERCER00433). His pain management had been difficult, with persisting low back pain and side effects from the medication. *Id.* Dr. Carpenter diagnosed depression with acute situational grief reaction, chronic lumbar pain and other painful joints, and adult-onset diabetes, stable. *Id.*

Carpenter's notes from February 20, 2009, reflect that Mercer's low back was still giving him a lot of trouble. (MERCER00434). Carpenter documented that Mercer experienced a rather constant pressure-like pain in the lumbar region that waxed and waned throughout the day. *Id.* His pain medication helped, but there was a balance between too much sedation and not enough energy, versus adequate pain control. *Id.* Mercer's depressive symptoms were definitely less intense, and he was sleeping better. *Id.* His chronic pain management was relatively stable, but he still had to deal with a lot of discomfort. *Id.*

On March 13, 2009, Carpenter noted that Mercer's mood control had been very difficult over the past month. (MERCER00435). Many days, Mercer just wanted to curl up in a dark room. *Id.* His low back was tender to palpation, but he ambulated normally. *Id.* His chronic pain management was exacerbated by a worsening depressive disorder. *Id.*

On April 1, 2009, Mercer followed-up with Dr. Carpenter for pain management, mood disorder, insomnia, and hematuria. (MERCER00436). Mercer's mood was better and he was sleeping better, but he still awakened after four hours because of pain. *Id.* Overall, Mercer's lumbar pain had remained relatively stable on his dosages of methadone and hydrocodone. *Id.* His pain, when not exacerbated, was about a two on a ten point scale. *Id.*

Dr. Carpenter noted on May 12, 2009, that Mercer's low back pain was about the same, with waxing and waning pain control. (MERCER00436). His pain was worse at night, and his

right shoulder had started to hurt again.  *Id*.  He noted that Mercer might need to see an orthopedist again.  *Id*.  Carpenter further remarked that Mercer's chronic pain management was stable:

> [h]e continues to work at home and other activities are somewhat limited for example he needs to use a motorized cart at the grocery store and recently they had to leave a concert early because of his pain intensification.  However he is appropriately getting relief from his narcotics and has not had dose escalation.

(MERCER00436).

On June 24, 2009, Carpenter saw Mercer for his chronic conditions of depression and chronic pain.  (MERCER00437).  Mercer continued to suffer from numerous painful areas, including his low back, mid-back, right shoulder, left elbow, and intermittent headaches.  *Id*.  He needed to balance over-sedation and poor concentration, with inadequate pain control.  *Id*.  Carpenter noted that Mercer's chronic pain management was difficult because of the various sources of pain and the need to balance the side effect of medications.  *Id*.

On July 23, 2009, Carpenter noted that Mercer's mood was more stable than it had been.  (MERCER00438).  Mercer demonstrated definite discomfort in the right lower lumbar region upon palpation.  *Id*.  However, there was no radiation down the legs, and his lower extremities were without edema, with intact sensation and strength.  *Id*.

Carpenter's treatment notes from September 24, 2009, reflect that Mercer struggled with constant daily pain and the inability to do much activity without exacerbating his low back problem.  (MERCER00439).  The condition was affecting his mental outlook and threatening his job security.  *Id*.  Carpenter felt that a repeat MRI was needed to determine if a more aggressive therapy was warranted.  *Id*.  Mercer still was fairly tender in the lumbar region, but not as sensitive as on other occasions.  *Id*.  His lower extremities were without edema.  *Id*.

On November 9, 2009, Carpenter documented that Mercer's pain issues continued to escalate. (MERCER00440). His visits to physical therapy had not improved his condition. *Id*. Mercer was discouraged by his pain, which was affecting his home life and his ability to do his job. *Id*. Side effects from the medication and mental stress from the constant pain had affected his performance. *Id*. Mercer was concerned about losing his job. *Id*. Upon examination, Mercer was tender in the upper and lower lumbar region on palpation. *Id*. He was able to ambulate without problems. *Id*. He exhibited decreased sensation to touch over the medial dorsum of the right foot extending from his great toe to the mid-foot region. *Id*. Carpenter noted that Mercer's pain had worsened, and that he was feeling frustrated and a bit desperate. *Id*. The narcotics helped the pain, but caused minor side effects. *Id*.

Mercer saw Dr. Carpenter for the last time on December 9, 2009, for his chronic conditions of pain management, hypertension, diabetes, and rash. (MERCER00441). Carpenter noted that because of his disability, Mercer can no longer carry on his employment and was losing his insurance. *Id*. Dr. Carpenter indicated that disability onset appeared to be around February 2006. *Id*. From that point on, Mercer experienced progressively worsening low back pain, despite multiple interventions. *Id*. Mercer had chronic low back stiffness and discomfort. *Id*.

In a December 17, 2009, To Whom it May Concern letter, John Carpenter, M.D. stated that he advised Mercer to cease employment on December 16, 2009, because of his ongoing chronic medical conditions that contribute to his disability. (MERCER00451). His persistent chronic pain from degenerative disc disease caused significant problems with his ability to perform his job duties. *Id*.

On January 12, 2010, Dr. Carpenter completed a "Medical Request Form," supplied by LINA.  (MERCER00496-00498).  Carpenter indicated that the primary diagnosis was chronic low back pain, lumbar degenerative disk disease.  *Id*.  He wrote that Mercer's pain had worsened such that it prevented him from normal activities.  *Id*.  He opined that Mercer could not lift, bend, push, or climb.  *Id*.  Mercer's constant pain and medication interfered with his cognitive functioning.  *Id*.  The pain was not controlled despite therapies.  *Id*.  Carpenter indicated that in an eight hour work day, with positional changes and normal breaks, Mercer could sit, stand, walk and reach occasionally (i.e., for less than 2.5 hours).  *Id*.  He noted that these limitations were supported by objective findings.  *Id*.  Dr. Carpenter further opined that Mercer should be restricted from work for over one year.  (MERCER00496-00497).  Carpenter explained that Mercer could not perform any repetitive motion of the lower back.  *Id*.  His constant pain could only be relieved by high doses of narcotics that affected his cognitive functioning.  *Id*.

### b.     November 10, 2009 MRI

A November 10, 2009, MRI indicated that plaintiff suffered from multilevel lower lumbar spondylosis.  (MERCER00350-351).  Specifically, the MRI noted mild canal stenosis at L4-5 with significant contact of the exiting right L4 nerve root due to facet hypertrophy and superimposed moderate disc protrusion.  *Id.*  Also, there was brief contact with the exiting, bilateral L5 nerve root.

### c.     Harrisonburg VA clinic medical records

Plaintiff was seen at the Harrisonburg VA Clinic on January 4, 2010, for back pain. (MERCER00461-465).  Although he was walking without assistance, he needed a new wheelchair, which was ordered.  *Id*.  Mercer rated his chronic back pain as a five on a ten point scale.  *Id*.

On January 27, 2010, Mercer was seen at the VA Clinic for a psychiatric consultation. (MERCER00456-00460).  The physician noted a history of depression/anxiety.  *Id*.  Mercer stated, however, that he had been doing well currently.  *Id*.  He mood had been good, with no anxiety.  *Id*.  He even had not taken his anxiety medication within the past two weeks.  *Id*.  In fact, Mercer was in a "great" mood.  *I d*.  He was alert and oriented to all spheres.  *Id*.  The physician diagnosed depressive disorder NOS and assigned a Global Assessment of Functioning ("GAF") score of 70.  *Id*.

### d.   Augusta Physical Therapy Notes

A September 22, 2009, physical therapy note from Augusta Physical Therapy reflects that Mercer reported a history of bilateral knee and low back pain, and that he was being seen for strengthening and endurance exercises.  (MERCER00491).  Mercer reported that he could not stand for more than two minutes and could walk for less than 100 yards.  *Id*.  The September 22, 2009, note further indicated that he received strengthening exercises on a LifeGlider exercise chair for lower body strength and endurance, and tolerated 30 minutes of exercise well. *Id.*

Between September 22, 2009, and October 29, 2009, Mercer received nine physical therapy treatments at Augusta Physical Therapy.  (MERCER00494).  Upon discharge, the physical therapist noted that plaintiff had tolerated about an hour of exercise in the LifeGlider exercise chair for trunk and lower extremity strengthening.  *Id.*  Although, Mercer was able to exercise vigorously for about an hour twice per week (burning the same amount of calories as if he were walking quickly for an hour), the exercise did not improve his low back condition.  *Id.*

### e.   LINA's Review and Denial

As part of its decision-making process, LINA submitted Mercer's information to a Nurse Case Manager ("NCM") for review.  (MERCER00449).  On February 16, 2010, Alison Juhl, an

NCM for LINA, reviewed plaintiff's files and noted that there were no clinical exam findings such as loss of range of motion, loss of strength, or gait disturbances to support a functional loss. (MERCER00449).

Accordingly, on February 18, 2010, LINA sent Mercer a letter advising him that his claim for LTD benefits had been denied.  (MERCER00024-00025).  In the denial letter, LINA noted that plaintiff had been out of work since December 16, 2009, because of lower back pain and degenerative disk disease.  *Id.*[5]  LINA then summarily concluded that plaintiff's case was closed and that no benefits were payable.  *Id.*  However, LINA advised Mercer that he had a right to appeal the benefit determination and provided him with a list of particular medical evidence which he could submit to LINA in order to support his claim.  *Id.*  Specifically, LINA suggested that additional information could include physician's office notes, hospital records, consultations, test result reports, therapy notes, and physical and/or mental limitations for the period of December 16, 2009, forward.  *Id.*  LINA also suggested providing medical records that clearly stated plaintiff's restriction and limitations from performing his own occupation and documentation of functional loss.  *Id.*

## 2.   *Plaintiff's first level appeal*

On April 6, 2010, plaintiff appealed LINA's denial.  (MERCER00426).  He submitted supplemental medical information, apparently comprised of additional medical records from the University of Virginia for the time period of September 18, 1986, through September 21, 2009.

---

[5]  Although LINA noted that Dr. Carpenter had completed a Medical Request Form on January 12, 2010, LINA indicated that Carpenter did not document any functional loss from Mercer's condition.  *Id.*  The decision also failed to mention Dr. Carpenter's treatment records for the year leading up to Mercer's disability.  Instead, LINA simply observed that there was no indication of range of motion, strength, or gait deficits from Mercer's December 9, 2009 office visit with Dr. Carpenter or the January 2010 visits to the VA Outpatient Clinic.  *Id.*

(MERCER00346-00377).  Plaintiff's counsel also provided LINA with the April 23, 2010,

Functional Capacity Evaluation Summary ("FCE"), administered by Steve Allison, DPT.

(MERCER00379-00414).

In his FCE summary, Allison determined that Mercer had the functional capacity for

sedentary work.  *Id*.  He added, however, that Mercer's tolerance level for sitting was only

"frequent," (i.e. from 2.5 hours up to 5.25 hours in an 8 hour day), further specifying that plaintiff

could sit for up to 40 minutes each hour followed by a 20 minute interruption to walk around.  *Id*.

In the course of his evaluation, Allison administered a "Sit Tolerance Test" which revealed that

plaintiff was able to tolerate a 60 minute sitting period with no breaks, but with the need for

frequent postural changes.  *Id*.  The prolonged sitting, however, increased plaintiff's pain level.

*Id*.

Allison further determined that Mercer could stand occasionally, meaning that he could

stand no more than 20 minutes each hour, followed by a 40 minute interruption to sit.  *Id*.  A

"Stand Tolerance Test" indicated that Mercer could sustain a maximum tolerance of one minute

of continuous standing with three sitting breaks, for a total standing time of five minutes.  *Id*.

As recounted earlier herein, Allison concluded that Mercer "demonstrated objective

evidence of physical impairments and functional limitations that will significantly limit his

ability to return to any past relevant work."  *Id*.  Allison further noted that Mercer "may also have

neuropsychological impairments associated with depression and the side effects of his

medications that will significantly interfere with his ability to tolerate gainful employment."  *Id.*

However, concerning these possible neuropsychological impairments, Allison suggested that a

comprehensive neuropsychological evaluation would be helpful to determine the effect that these

impairments would have on plaintiff's ability to function in a work environment.  *Id.*

16

On April 14, 2010, Christine Newman, another LINA NCM, noted that the additional evidence submitted by plaintiff contained information prior to his alleged disability onset date and, therefore, did not impact the prior benefit determination.  (MERCER00424).

On May 25, 2010, one of LINA's Medical Directors, Dr. Paul Seiferth, reviewed the claim file.  *Id*.  He noted that the results of the FCE demonstrated that plaintiff had a residual functional capacity for sedentary work, which was consistent with the physical demands of the plaintiff's regular occupation.  (MERCER00125).  Dr. Seiferth further noted that there was no documentation of any untoward effect of pain medications or any formal or informal assessment of cognitive status.  *Id.*

That same day, LINA issued a letter to plaintiff's counsel advising him that it had upheld its prior decision to deny plaintiff's claim.  (MERCER00017-00019).  LINA explained that "[t]o ensure appropriate interpretation of the medical documentation on file, a review was completed with our Medical Director."  *Id*.  LINA noted that, according to the April 23, 2010, FCE, Mercer was able to perform sedentary work.  *Id*.  Moreover, although office notes documented Mercer's subjective complaints of pain, they failed to provide specific restrictions and limitations.  *Id*. LINA added that

> while we understand that your client may experience pain, there are no examination findings such as decreased range of motion, decreased strength, or any formal or informal testing on file to demonstrate a cognitive deficit. . . . Therefore, the medical evidence fails to support disability and we must affirm our previous decision to deny long term disability benefits.

*Id*.

As it did in connection with its initial denial, LINA again advised plaintiff of his right to appeal the benefit determination, and provided plaintiff with a list of suggestive medical evidence that he could submit to LINA to support his claim.  *Id*.

### 3.       *Plaintiff's second level/voluntary appeal*

On October 13, 2010, plaintiff's counsel submitted a request for further review to LINA. (MERCER00314-00316).  In support of his appeal, plaintiff submitted additional records from the VA Hospital (from July 29, 2010 through October 26, 2010) (MERCER247-00313, 00329), as well as a vocational evaluation provided by Richard Galloway, Ph.D., a Licensed Rehabilitation Counselor.  (MERCER00317-00325).

### a.       VA Hospital Records

On July 29, 2010, Mercer reported to a physician that his left knee pain was consistent, but bearable.  (MERCER00329).  Mercer explained that over the years, his left knee pain had progressively worsened.  *Id*.  Hydrocodone provided good pain relief, but with the side effect of drowsiness.  *Id*.  Mercer also used methadone for pain relief, without the side effect of drowsiness.  *Id*.  Mercer described daily flare-ups several times per day that increased his pain to 7/10 on the pain scale, where 10 represented unbearable pain.  *Id*.  These flare-ups, however, did not incapacitate him.  *Id*.  He used a wheelchair because of an inability to stand or walk for more than five minutes.  *Id*.

The physician observed Mercer hold onto nearby furniture and demonstrate "objective evidence of pain and facial grimacing with standing and sitting."  *Id*.  The physician also documented "objective evidence of tenderness and guarding to the bilateral knee joint."  *Id*.  Mercer had a leg length discrepancy.  *Id*.  There was no evidence of muscle atrophy or muscle wasting of the bilateral lower extremities.  *Id*.  However, motor strength in the bilateral, lower extremities was 4/5 due to weakness.  *Id*.  The physician noted joint crepitus with passive range of motion of the joints.  *Id*.  He was unable to toe, heel, and tandem walk or squat due to bilateral

knee pain and discomfort.  *Id*.  His deep tendon reflexes were hyperreflexive and  3+ bilaterally.
*Id*.

On August 10, 2010, Mercer telephoned the VA Pain Management Clinic voice line to
renew his prescription.  (MERCER00309).  Mercer had no complaints of unacceptable pain.  *Id*.
His pain was 2/10, with no complaints of any side effects.  *Id*.  He received a prescription for
methadone and oxycodone.  *Id*.

On September 6, 2010, Mercer went to the VA emergency room with complaints of right
shoulder pain.  (MERCER00304-00306).  The emergency room referred Mercer for an
orthopedic consultation.  *Id*.  Mercer indicated that his shoulder pain was 1/10 when not moving,
but increased to 10/10 while moving.  *Id*.

On September 7, 2010, Mercer called the pain clinic voice line to renew his narcotic
medication for his chronic low back pain.  (MERCER00303).  He had no complaints of
unacceptable pain or any side effects.  *Id*.  Mercer rated his pain at 3/10.  *Id*.

Mercer underwent a physical examination at the VA Hospital on September 14, 2010.
(MERCER00295-00300).  At that time, his right shoulder pain had improved.  *Id*.  He had a
history of tachycardia, asymptomatic – a nuclear stress test showed mild ischemia, with normal
ejection fraction.  *Id*.  He was compliant with his medication.  *Id*.  His depression had improved a
lot.  *Id*.  The physician diagnosed, *inter alia*, tachycardia, asymptomatic; hypertension,
controlled; diabetes mellitus II; GERD vs. dysphagia; constipation; chronic pain (back,
shoulders, and knees); and depression, stable.  *Id*.

On September 28, 2010, Mercer was seen by the staff psychiatrist at the VA Hospital.
(MERCER00284-00286).  Notes reflect that Mercer was rated 20 percent disabled at the VA, and

was trying to increase the benefit.  *Id*.  He was oriented x4; memory x3.  *Id*.  The psychiatrist

diagnosed mood disorder due to general medical condition, and assigned a GAF of 70.  *Id*.

On October 6, 2010, Mercer presented to the pain management clinic for follow-up for

management of chronic low back and bilateral shoulder pain. (MERCER00279-00284).  Mercer

reported that his current medication was not adequately controlling his pain.  *Id*.  He described

his pain as a dull, intense ache in his low back and rated it as a 2/10.  *Id*.  He reported no adverse

side effects.  *Id*.  He appeared alert and oriented.  *Id*.

### b.    Dr. Galloway's Report

Dr. Galloway evaluated Mercer on September 24, 2010.  (MERCER00317-00325).  He

noted that Mercer used a wheelchair and moved about in a cumbersome manner, but had

cooperated and expressed himself well. *Id*.  (MERCER00317).  Following the consultation,

Galloway opined that any attempts at helping plaintiff secure employment or to participate in any

on-going vocational rehabilitation would need to be deferred.  (MERCER00322).

### c.    LINA's Review and Denial

On December 15, 2010, LINA re-submitted Mercer's  information to Dr. Seiferth for

further review.  (MERCER00108-00111).  Dr. Seiferth reviewed the additional information and

noted that the medical records from the VA Hospital presented no formal or informal cognitive

assessment or measurements establishing a cognitive impairment.  (MERCER00110).  He noted

that the records indicated that plaintiff was consistently alert, oriented to person, place and time,

and in no acute distress.  *Id.*  He remarked that the FCE results indicated that Mercer could

function at the sedentary level.  *Id.*  Finally, Dr. Seiferth explained that although the FCE

evaluator commented on possible cognitive problems, no formal or informal assessment of

cognition was provided to establish any cognitive deficits stemming from plaintiff's use of pain

medications.  *Id.*  Accordingly, Dr. Seiferth determined that Mercer's reported work limitations and restrictions were not supported by the evidence.  *Id.*

On December 16, 2010, LINA sent a letter to plaintiff's counsel advising him that it was upholding its prior decision to deny plaintiff's claim.  (MERCER00005-00007).  LINA stated that the medical information failed to "provide consistent medical evidence of a severe, functional impairment that would preclude Mr. Mercer from performing *all* the material duties of his occupation."  *Id*.  (emphasis added).  LINA noted that Mercer's GAF of 70 denoted but mild symptoms or difficulty in social or occupational settings.  *Id*.  LINA recounted the April 23, 2010, FCE, but did not mention the limitations regarding plaintiff's need to stand for 20 minutes per hour.  *Id*.  LINA concluded that plaintiff had exhausted all administrative levels of appeal, and that no further appeals would be considered.  (MERCER00006).

### 4.    *The SSA decision and Dr. Carpenter's February 6, 2011 letter*

On February 16, 2011, plaintiff's counsel sent a letter to LINA asking LINA to consider an attached February 1, 2011, decision from the Social Security Administration ("SSA") regarding plaintiff's claim for Social Security Disability Benefits, and a letter from Dr. Carpenter, dated February 6, 2011.  *See* Pl. MSJ, Exh. A.

In the SSA decision, an Administrative Law Judge ("ALJ") determined that Mercer was disabled as of December 17, 2009.  *Id*.  In so deciding, he determined that Mercer suffered from severe impairments of obesity, degenerative disc disease of the spine, degenerative joint disease of the right upper extremity and depression.  *Id*.  These impairments resulted in a residual functional capacity for sedentary work, reduced, *inter alia*, by the need for a wheelchair, a sit/stand option, occasional stooping, kneeling, and crouching, the inability to reach overhead, plus moderate limitations on his ability to understand, remember and carry out simple tasks,

21

where moderate was defined as more than a slight limitation, but the individual is still able to function satisfactorily.  *Id*.  The ALJ determined that not only could Mercer not perform any of his past relevant work, he also could not make an adjustment to other jobs that exist in significant numbers in the national economy. *Id*.

In his February 6, 2011, letter, Dr. Carpenter stated that an MRI corroborated evidence of degenerative disc disease that correlated to Mercer's physical symptoms.  (Pl. MSJ, Exh. A).  Carpenter noted that the symptoms could not be completely controlled and that his medication had significant side effects.  *Id*.  He remarked that Mercer's job skills suffered, and there was documented evidence that his work performance was being called into question because of his physical symptoms and the cognitive side effects of his pain medications.  *Id*.  Mercer "was trapped between the need to medicate sufficiently to control his pain and depression and the sedating and mentally slowing side effects of appropriate doses of medication."  *Id*.

On February 24, 2011, LINA sent plaintiff's counsel a letter stating that it was unable to consider an appeal of Mercer's LTD claim.  (MERCER00001-00002).  LINA stated *inter alia*, that Mercer's November 10, 2009, MRI "did not indicate significant findings such as nerve root compression, severe spinal stenosis, or disc herniations."  *Id*.  LINA conceded that Dr. Carpenter's letter documented that Mercer condition and symptoms impacted his work, but there was nothing to indicate a loss of "global functioning."  *Id*.

As to the SSA decision, LINA stated that it was aware that Mercer had been awarded benefits, but that the standard for determining disability under the Plan may be different from the standard used by the SSA.  *Id*.  Without an opinion from the SSA explaining the basis for its

decision, LINA could not evaluate its reasoning, or promote the decision of the SSA over that of other proof and Plan information.  *Id*.[6]

### 5.    Compensation for LINA's Claims Managers and Medical Directors

Plaintiff propounded several discovery requests to LINA, and was able to glean that

> its claims managers and appeal unit managers are evaluated, in part, on the quality of their claims decisions, i.e., whether the claims were timely and accurately processed in accordance with the applicable claims documents.  They are not evaluated on the basis of the number or dollar amount of claims paid or denied.  In addition, those employees are paid fixed salaries that are tied to claims decision accuracy, not to the number or claims paid or claims denied or to claims outcomes.
>
> Incentive pay for Medical directors is discretionary and awarded based on overall qualitative performance during the calendar year.  LINA has previously described that performance is directly linked to the quality (credible and analytical) and thoroughness of a reviewer's analysis, and not on claim outcomes.  LINA's Medical Directors do not make claim determinations and their reviews are but one factor in a complex analysis performed by a claim manager of medical, vocational and earnings test information that combined, produce a claim determination.  Incentives for thorough, fair and accurate medical analysis can be awarded as a percentage of salary, restricted stock grants or stock options.  These are not mandatory and the amount awarded is based on a number of factors including individual performance, [LINA]'s overall performance and manager discretion.

(Interr. Resp. No. 2; Pl. MSJ, Exh.).

### Analysis

"ERISA was enacted 'to promote the interests of employees and their beneficiaries in employee benefit plans' and 'to protect contractually defined benefits.'"  *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 393 (5th Cir. 1998) (citation omitted).  To achieve these goals, ERISA requires every employee welfare benefit plan to,

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been

---

[6]  Of course, plaintiff's counsel sent LINA a copy of the ALJ's decision.

> denied, setting forth the specific reasons for such denial, written in
> a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim
> for benefits has been denied for a full and fair review by the
> appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

When deciding whether to pay or deny benefits, a plan administrator must make two general types of determinations: "[f]irst, [s]he must determine the facts underlying the claim for benefits. . . . Second, [s]he must then determine whether those facts constitute a claim to be honored under the *terms* of the plan." *Schadler*, 147 F.3d at 394 (citation omitted) (emphasis in original).  If a plan participant has been denied benefits, then ERISA permits a claimant to bring suit in federal court "to recover benefits due to him under the terms of his plan."  29 U.S.C. § 1132(a)(1)(B).

Under ERISA, the factual determinations made by the plan administrator or fiduciary are reviewed for abuse of discretion.  *Southern Farm Bureau Life Ins. Co. v. Moore*,  993 F.2d 98, 100-101 (5th Cir. 1993) (citing *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552 (5th Cir.1991)).  However, a plan administrator's interpretation or application of the plan is reviewed *de novo* "'"unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Aboul-Fetouh v. Employee Benefits Committee*,  245 F.3d 465, 471-472 (5th Cir. 2001) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 956-57 (1989)).

This court previously determined herein that

> LINA's determination that Mercer is not disabled is a factual determination that is
> subject to review for abuse of discretion, with the court weighing any conflict of
> interest (if established by the employee) as a factor in the analysis.  Furthermore,
> in the event that any issues of plan term interpretation arise in the course of these
> proceedings, the court shall review the issue(s) de novo.

(Sept. 21, 2011, Judgment [doc. # 22]).

Abuse of discretion is synonymous with the arbitrary and capricious standard of review.

*Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 651-652 (5th Cir. 2009) (citation omitted).

"When reviewing for arbitrary and capricious actions resulting in an abuse of discretion, we

affirm an administrator's decision if it is supported by substantial evidence."  *Id.*  Further,

> [s]ubstantial evidence is more than a scintilla, less than a preponderance, and is
> such relevant evidence as a reasonable mind might accept as adequate to support a
> conclusion.  An arbitrary decision is one made without a rational connection
> between the known facts and the decision or between the found facts and the
> evidence.

*Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007) (internal quotation
marks and citations omitted).

The court's "review of the administrator's decision need not be particularly complex or technical;

it need only assure that the administrator's decision fall somewhere on a continuum of

reasonableness-even if on the low end."  *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 247

(5th Cir. 2009) (citation omitted).

If the plan administrator has a conflict of interest, the conflict is weighed as one of several

different factors in determining whether there was an abuse of discretion.  *Holland, supra*

(citations omitted).   These unspecified factors depend upon the particular case and must be

weighed together before deciding whether the plan administrator abused its discretion.

*Schexnayder v. Hartford Life & Acc. Ins. Co.*, 600 F.3d 465, 469 (5th Cir. 2010) (citing *Metro.*

*Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 2351 (2008)).  "Any one factor may act as a

tiebreaker when the other factors are closely balanced, the degree of closeness necessary

depending upon the tiebreaking factor's inherent or case-specific importance."  *Id.*  (internal

quotation marks omitted).  Moreover, "a reviewing court may give more weight to a conflict of

interest, where the circumstances surrounding the plan administrator's decision suggest "procedural unreasonableness." *Id*. (internal quotation marks and citation omitted).

A plan administrator suffers from a structural conflict of interest when, as here, it serves in the dual capacity of rendering benefit decisions on behalf of a plan that it also funds. *Schexnayder, supra* (citing *Glenn, supra*). In other words, a benefit decision favorable to the plan participant, negatively impacts LINA's bottom line. The weight of this conflict of interest depends upon the circumstances of LINA's decision. *Schexnayder, supra*. In this case, because various considerations suggest procedural unreasonableness by LINA, its financial bias may have influenced its decision-making process, thus rendering its conflict a more significant factor.

### a.    LINA's Initial Denial of Benefits is Not Supported by Substantial Evidence

In its initial denial of Mercer's claim, LINA noted that Dr. Carpenter did not document any functional loss with regard to his condition and that Carpenter did not note any decreased range of motion, strength, or gait deficits in his December 9, 2009, office visit notes. *See* MERCER00024-00026. LINA also stated that it reviewed Mercer's claim with its NCM. *Id*. As to the January 12, 2010, Medical Request Form completed by Dr. Carpenter, LINA said only that Carpenter indicated that Mercer was restricted from work for one year due to pain. *Id*.

Carpenter, however, indicated far more than that on the LINA-supplied medical request form. He noted that Mercer's condition had worsened since 2006, and that he had been through multiple treatments and evaluations. (MERCER00496-00498). Critically, Carpenter opined that Mercer could only occasionally sit during an eight hour work day, i.e. up to 2.5 hours. *Id*. He also checked the associated box confirming that the limitation was supported by objective findings. *Id*. However, the LINA-provided form did not ask the physician to specify what the objective findings were. *Id*.

26

The court further emphasizes that according to the Plan, an employee's ability to work is based upon, 1) medical evidence submitted by the Employee; 2) Consultation with the Employee's Physician; and 3) evaluation of the Employee's ability to work by not more than three Independent Experts if required by the Insurance Company.  Here, there is no evidence that LINA consulted an *independent* expert to determine Mercer's ability to work.  LINA indicated that it reviewed the claim with its *own* nurse case manager.  Thus, the nurse case manager could not have been an *independent* expert.

Insofar as LINA may have interpreted the Plan to include its own nurse case manager as an independent expert, this is an issue of plan term interpretation that, because LINA does not enjoy discretionary authority to interpret plan terms, *see* discussion, *supra*, the court must review *de novo*.  When construing ERISA plan provisions, the court interprets the contract language "'in an ordinary and popular sense as would a person of average intelligence and experience,' such that the language is given its generally accepted meaning if there is one." *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir. 1997) (citations omitted) (quoted source omitted).  If the plan remains ambiguous after applying ordinary principles of contract interpretation, the court must then apply the rule of *contra proferentum* and construe the terms strictly in favor of the insured.  *Id*.

Here, the court finds no ambiguity.  No matter how one may construe "independent," its meaning cannot reasonably be stretched to include the decision-maker's "own" nurse.

In short, at the time that LINA issued its initial denial the sole "acceptable medical source" (to borrow a phrase from the Social Security regulations) authorized to provide an opinion on plaintiff's ability to work, according to the Plan, was plaintiff's treating physician, Dr. Carpenter.  He, of course, opined that plaintiff was unable to sit more than occasionally in an

eight hour day, which was incompatible with the DOT sitting requirements for the job.  *See* (MERCER00445-00447, 00330-00344) (requiring ability to sit most or majority of the time).  Moreover, plaintiff's job, as he actually performed it, required him to spend 100 percent of his time sitting.  (MERCER00511).[7]

In its decision, LINA plucked but one comment from Dr. Carpenter's assessment, and then incorrectly characterized the evidence as including no functional limitations, when Carpenter unambiguously limited Mercer to less than sedentary work.  Furthermore, other than soliciting information from Carpenter via the medical request form, and then all but ignoring the response, there is no indication LINA endeavored to "consult" with Carpenter as contemplated under the Plan.  The court readily concludes that LINA's initial decision to deny benefits was arbitrary and not supported by substantial evidence.

**b.     LINA's First Level Appeal is Not Supported by Substantial Evidence**

In its decision denying Mercer's first level appeal, LINA noted that Mercer was employed as a programer analyst, which was an occupation with sedentary demand activities according to the Dictionary of Occupational Titles.  (MERCER00017-00019).  LINA further represented that it had reviewed Mercer's complete file without deference to its prior review(s).  *Id*.  LINA noted that "[t]o ensure appropriate interpretation of the medical documentation on file, a review was completed with our Medical Director."  *Id*.

---

[7]  Although the Plan purports to eschew the particular work tasks that the employee performed for his employer when assessing the employee's regular occupation, *see* Plan definition of "Regular Occupation," the claimant's specific job duties serve to illustrate how that job is performed in the general labor market.  *See Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 396 (5th Cir. 2006).

The court again emphasizes, however, that LINA's medical director, Dr. Seiferth, was not an "independent expert" under the Plan, and thus was not one of the three enumerated sources that LINA could consider to determine Mercer's ability to work per the Plan.  First, as one of *LINA*'s medical directors, Seiferth was by no means independent.  Moreover, in its discovery responses, LINA made it clear that Seiferth did not make the claim determination.  (Interr. Resp. No. 2; Pl. MSJ, Exh.).  Rather, LINA plainly enlisted Seiferth's services for purposes of his medical analysis.  *Id*.  While it is manifest that ERISA does not prohibit the plan administrator from crediting the opinion of a reviewing physician over that of a treating physician, *see e.g.*, *McDonald v. Hartford Life Group Ins. Co.*, 361 F. App'x 599 (5th Cir. Jan. 19, 2010) (unpubl.), under the unequivocal terms of *this* Plan, only three categories of evidence are considered when determining a claimant's ability to work.  Dr. Seiferth does not fall into any of the three categories.

Furthermore, Dr. Seiferth reviewed the results of the FCE administered by Steve Allison, and summarily observed that it demonstrated a residual functional capacity for sedentary work, which Seiferth believed was consistent with Mercer's own occupational demands. (MERCER00125).  However, there is no indication that Dr. Seiferth is a licensed vocational expert, and even if he otherwise qualified as an independent expert, his opinion on whether Mercer's residual functional capacity was consistent with his occupational demands was rendered outside the scope of his medical license, and thus transgressed the Plan requirement that independent experts render opinions solely within the scope of their expertise.

In its first level appeal decision, LINA relies heavily upon its characterization of the April 23, 2010, FCE as sanctioning a residual functional capacity for sedentary work. (MERCER00018).  This superficial characterization of the FCE, however, glosses over the fact

29

that the physical therapist found that Mercer could sit but 40 minutes per hour, with the need to move about for 20 minutes per hour.  There is no indication that this limitation is consistent with either the full range of sedentary work or the demands of plaintiff's occupation.  In fact, Allison remarked that the FCE "demonstrated *objective* evidence of physical impairments and functional limitations that will significantly limit [Mercer's] ability to return to any past relevant work." (emphasis added).  Moreover, plaintiff later submitted evidence to LINA from a vocational consultant, Dr. Galloway, who, relying upon Allison's FCE, opined that Mercer could not sustain work on an eight hour basis, day-in and day-out.  (MERCER00319).  Of course, Galloway was the sole vocational expert to have evaluated Mercer, and Allison administered the sole FCE performed on plaintiff.

While ERISA certainly does not compel a plan administrator to consult a vocational expert, the reviewing courts are empowered to decide "on a case-by-case basis, whether under the particular facts the plan administrator abused his discretion by not obtaining the opinion of a vocational rehabilitation expert."  *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1309 (5th Cir. 1994).  In this case, LINA appears to have concluded that because the FCE superficially indicated that Mercer retained the exertional capacity for sedentary work, this meant that he was able to perform his own occupation which also was performed at the sedentary level.  LINA's conclusion in this regard was supported by the opinion of its *medical* director, Dr. Seiferth. However, had LINA fully considered the FCE, it would have been apparent that Mercer did not retain the ability to sit for the extended periods required by his occupation, *unless* he also was permitted to stand and walk about for 20 minutes for hour.  There is no evidence that this sit/stand  option was consistent with Mercer's own occupation, either as he actually performed it, or as the job was generally performed in the economy.  Under these circumstances, LINA abused

its discretion by not consulting another vocational expert  – if, as it seems here, LINA was not inclined to accept the opinion of Dr. Galloway.

   c.   **LINA's Second Level/Voluntary Appeal is not Supported by Substantial Evidence**

On December 16, 2010, LINA issued a decision upholding its prior denials. (MERCER00005-00007).  The decision stated that LINA had reviewed Mercer's complete file, without deference to the prior reviews.  LINA maintained that the medical information failed to provide consistent medical evidence of a severe functional impairment that would preclude Mercer from "performing *all* the material duties of his occupation."  *Id*.  (emphasis added).[8] LINA also mentioned that Dr. Carpenter's December 9, 2009, office note did not include any physical examinations to indicate how the MRI findings caused functional loss. (MERCER00006).  However, LINA again failed to address Dr. Carpenter's monthly office visit notes for more than one year before his alleged disability onset date, wherein Carpenter documented Mercer's ongoing struggle with his lower back pain.  LINA also declined to credit Mercer's persistent complaints of back pain, that his physicians (other than, or in addition to Dr. Carpenter) found credible enough to warrant prescriptions for daily maintenance levels of narcotic pain relievers.[9]

---

   [8]  LINA, however, clearly misconstrued the Plan, insofar as it purported to require proof of Mercer's inability to perform *all* of the material duties of his occupation.  *Compare* MERCER00218 (an employee is disabled, *inter alia*, if he or she is "unable to perform the material duties of his or her Regular Occupation . . .").  This error further taints LINA's factual determinations.

   [9]  In *Audino v. Raytheon Co. Short Term Disability Plan*, the Fifth Circuit remarked, [w]e are also troubled by MetLife's failure to accord weight to Audino's consistent complaints of pain, even though those complaints were documented in her medical records for years before she sought benefits and there is no indication that she overstated her pain once she decided to seek benefits. We have recognized

31

LINA also emphasized that

[a]t this time no measurable exam findings or diagnostic testing has been provider [sic] that would support a significant loss in range or motion, strength, sensation or reflexes in Mr. Mercer's back or extremities.  Nothing has been reported regarding vascular or neurological deficits or muscle atrophy.  No mental status exam, cognitive testing, or treatment plan has been submitted that would support the restrictions of no work due to cognitive deficits.  There was no documentation of severity, frequency, and modality of treatment, condition, or symptoms that would be consistent with severe mental illness that would cause a functional impairment.

(MERCER00006).

LINA did not err by requiring specific testing to support a finding that Mercer's cognitive functioning was impaired by his narcotic pain medication or because of mental illness. *See Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 514 (5th Cir. 2010) (it is not an abuse of discretion for the plan administrator to require objective verification of the functional limitations caused by a claimant's medical or psychological condition).  However, as discussed earlier in this opinion, the FCE provided objective evidence of the *physical* functional limitations caused by plaintiff's back impairment.  Moreover, the MRI diagnostic test documented significant contact with the nerve root.  (MERCER00350-351).[10]

Furthermore, although LINA indicated that there were no examination findings to support significant loss in range of motion, strength, or sensation, LINA appears to have overlooked, *inter alia*, Mercer's July 29, 2010, examination where the physician documented "objective

_____

that pain cannot always be objectively quantified and have faulted an administrator for "focus[ing] on [ ] tests, rather than the pain and its effect[.]" *Audino v. Raytheon Co. Short Term Disability Plan*, 129 F. App'x 882, 885 (5th Cir. Apr. 13, 2005) (unpubl.) (citation omitted).

[10]  Albeit, LINA dropped the "significant" adjective from its characterization of the MRI results in its second level appeal decision, and in its February 24, 2011, letter, LINA omitted any reference of nerve root contact at all.  *See* MERCER00001-00002.

32

evidence of tenderness and guarding to the bilateral knee joint," a leg length discrepancy, 4/5

motor strength in the bilateral extremities due to weakness, and joint crepitus.

(MERCER00329).

　　　LINA's mischaracterization of the record evidence serves to further confirm that its

decision to deny benefits was arbitrary, capricious and not supported by substantial evidence.

*See Audino, supra* (review physicians' oversights in their analysis of the medical record

undermined the plan administrator's decision).

### d.　LINA's Failure to Consider Mercer's Favorable SSA Award was Procedurally Unreasonable

　　　LINA contends that this court should not consider the SSA decision because it was not

before LINA at the time it made its determination.  (Def. Memo., pg. 24 [doc. # 28]).  However,

the Fifth Circuit has held unequivocally that "[b]efore filing suit, the claimant's lawyer can add

additional evidence to the administrative record simply by submitting it to the administrator in a

manner that gives the administrator a fair opportunity to consider it."  *Vega v. Nat'l Life Ins.*

*Services, Inc.*, 188 F.3d 287, 300 (5th Cir. 1999) (*en banc*).  If done, then the additional evidence

should be treated as part of the administrative record.  *Id*.

　　　Here, plaintiff's attorney submitted the SSA decision to LINA and asked LINA to

consider it before he resorted to litigation.  (Feb. 16, 2011, Letter; Pl. MSJ, Exh. A).  Moreover,

LINA responded to the letter, and stated that it was aware that Mercer had been awarded

disability.  (MERCER00001-00002).  LINA explained, however, that without a copy of the SSA

decision, it could not evaluate the SSA's reasoning.  *Id*.

　　　Conversely, plaintiff's letter indicated that he enclosed a copy of the SSA decision.  *See*

Pl. MSJ, Exh. A.  Moreover, had LINA bothered to peruse the SSA decision, it would have

learned that the Commissioner made a finding of disability in plaintiff's favor, under a standard that was analogous to the one under the Plan.  In particular, the SSA Commissioner found that although Mercer retained the residual functional capacity ("RFC") for sedentary work, his RFC was reduced, *inter alia*, by his need for a wheelchair and a sit/stand option.  *Id*.  Given this RFC for limited sedentary work, the Commissioner determined that the demands of Mercer's past relevant work exceeded his RFC, and thus, he was unable to return to his former position.  *Id*.[11] The Commissioner further found that Mercer's RFC and vocational factors did not permit him to make an adjustment to other work that exists in substantial numbers in the national economy.  *Id*. Accordingly, the Commissioner found Mercer disabled as of December 17, 2009.  *Id*.[12]

Furthermore, as in *Glenn* and *Schexnayder*, LINA encouraged Mercer to apply for SSA benefits because this would reduce LINA's payments to Mercer had LINA ultimately found him disabled.  *See* MERCER0007, 00084.  On the other hand, when consideration of the SSA's disability determination was not in LINA's financial interest, LINA declined to consider it.  This dichotomy, which coincides with LINA's self-interest, suggests procedural unreasonableness and empowers the court to accord more weight to LINA's structural conflict of interest.  *Glenn, supra*.[13]

---

[11] The court notes that under SSA regulations, past relevant work is defined as "the actual demands of past work or 'the functional demands ... of the occupation as generally required by employers throughout the national economy.'"  *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987) (citing Social Security Ruling 82-61).  Thus, the SSA's past relevant work determination is even more restrictive than the Plan's own occupation inquiry which only focuses on the employee's job as it is generally performed in the economy.

[12] There is no indication that the Commissioner had any more medical evidence before him, than what is contained in the instant administrative record.

[13] In *Schexnayder*, the Fifth Circuit stated that the plan administrator/insurance company need only mention the contrary findings by the SSA, and then proffer some facially plausible

### e.      The Limited Benefit Period Provision is Not Applicable

LINA contends that even if plaintiff was disabled from performing his own occupation

(or even any other occupation), his benefits are capped at 24 months because Mercer alleged that

his disability was caused by, or contributed to by his depression and anxiety.  (Def. MSJ, Memo.,

pg. 5).  All along, of course, LINA has maintained that plaintiff was not disabled at all.  For

instance, in its second level appeal denial on December 16, 2010, LINA noted that Mercer had a

GAF score of 70, which denoted but mild symptoms.  (MERCER00006).[14]  Moreover, LINA

indicated in its decision that Mercer ceased working because of his chronic back pain and

degenerative disc disease – not because of his mental impairment(s).  (MERCER00005).  LINA

also expressly found that "[t]here was no documentation of severity, frequency, and modality of

treatment, condition, or symptoms that would be consistent with severe mental illness *that would*

*cause a functional impairment*."  (MERCER00006) (emphasis added).

In contrast to LINA's assessment of the effects of plaintiff's physical impairments, the

court finds that LINA's determination that plaintiff's mental impairment(s) did not functionally

limit his ability to work is supported by substantial evidence.  Accordingly, Mercer's mental

impairments did not cause or contribute to his disability.

---

rationale for declining to assign it any particular weight.  *See Schexnayder, supra*.  Here, LINA
stated that it could not evaluate the reasoning of the SSA decision, because it did not have a copy
of the opinion.  (MERCER00001).  However, plaintiff's counsel's February 16, 2011, letter to
LINA indicates that he enclosed a copy of the SSA decision.  (Pl. MSJ, Exh. A).  Certainly, if
LINA did not receive the enclosure, it should have taken steps to obtain it.  Accordingly, LINA's
proffered rationale for distinguishing the SSA decision rings hollow.

[14]  Although the SSA ALJ determined that Mercer suffered from depression with
moderate limitations in his ability to understand, remember, and carry out simple tasks, the ALJ
indicated that he was still able to function satisfactorily, despite these limitations.  (Pl. MSJ,
Exh.).

**f.      Attorney's Fees are Appropriate in this Case**

Plaintiff requested an award of attorney's fees.  Under ERISA, "the court in its discretion may allow a reasonable attorneys' fee and costs of action to either party." 29 U.S.C. § 1132(g)(1).[15]  "A fees claimant must show "some degree of success on the merits" before a court may award attorney's fees under § 1132(g)(1) . . ."  *Hardt v. Reliance Standard Life Ins. Co.*, ___ U.S. ___, 130 S.Ct. 2149, 2158 (2010) (internal quotation marks and citation omitted).  In deciding whether to award attorneys' fees, the court *may* consider the following five "*Bowen*" factors:[16]

    1.      The degree of the opposing parties' culpability or bad faith;

    2.      The ability of the opposing parties to satisfy an award of attorneys' fees;

    3.      Whether an award of attorneys' fees against the opposing party would deter other persons acting under similar circumstances;

    4.      Whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

    5.      The relative merits of the parties' position.

*Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1458 (5th Cir. 1995) (citing *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980)).

Here, the court has no difficulty concluding that plaintiff is a prevailing party on the merits.  Accordingly, the court may proceed to consider the *Bowen* factors.

As to the first factor, the court notes that a conflict of interest, in and of itself, does not establish that the plan administrator acted in bad faith.  *Schexnayder, supra* (citation omitted).

---

[15]  Upon finding that the administrator abused his discretion, the court may award attorney's fees to the claimant.  *Vega, supra* (emphasis added).

[16]  *See Hardt*, 130 S.Ct. at 215, n8.

However, this court has awarded attorney fees to a plan participant where, as here, the court found that the plan administrator's decision to deny benefits constituted an abuse of discretion. *Petty v. Ret. Plan of Int'l Paper Co.*, Civil Action No. 05-1094, 2007 WL 3023932 (W.D. La. Oct. 16, 2007).

Although no evidence was adduced regarding LINA's ability to pay attorney's fees, this case had but limited discovery and was decided on the briefs. Thus, the attorney fee award should not prove excessive. If LINA is able to fund benefits for other claimants and for the instant plaintiff, there is no apparent reason why it could not satisfy an award for attorney's fees as well. Moreover, an award of attorney's fees in this case may help motivate other conflicted plan administrators to buttress their claims review procedures. *See Tesch v. Prudential Ins. Co. of Am.*, Civil Action No. 09-1697, 2011 WL 5570085 (W.D. La. Nov. 16, 2011) (citation omitted).

As to the fourth *Bowen* factor, the court finds that plaintiff did not seek to benefit any other participants or beneficiaries, or to resolve a significant legal question regarding ERISA. Finally, the court finds that although LINA did not prevail herein, it advanced well-reasoned arguments, that if credited, could have compelled a different outcome.

Upon consideration of the foregoing factors, the undersigned recommends that attorney fees be awarded in favor of plaintiff

### g.    Reverse and Render

In the event that this court were to determine that the SSA decision was significant – an event that has come to pass – LINA contends that the court should remand the matter to LINA, so it would have an opportunity to consider the evidence. However, LINA already had the opportunity to consider the SSA decision, but declined to do so. Moreover, the SSA decision

was not determinative in this case because the court determined that LINA abused its discretion, even without reference to the SSA findings.

The court recognizes that "[i]n some special circumstances a remand to the administrator for further consideration may be justified." *Vega*, 188 F.3d at 302, n13.  In *Vega*, however, the *en banc* Fifth Circuit declined remand for further record development, emphasizing that

> [w]e want to encourage each of the parties to make its record before the case comes to federal court, and to allow the administrator another opportunity to make a record discourages this effort. Second, allowing the case to oscillate between the courts and the administrative process prolongs a relatively small matter that, in the interest of both parties, should be quickly decided. Finally, we have made plain in this opinion that the claimant only has an opportunity to make his record before he files suit in federal court, it would be unfair to allow the administrator greater opportunity at making a record than the claimant enjoys.

*Id*.

The same reasoning counsels against remand for reconsideration here.  *See Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 397 n5 (5th Cir. 2006).

### h.    Additional Grounds not Argued by the Parties

To the extent that the court's reasoning herein expanded upon, or diverged from the arguments advanced by the parties, the undersigned notes that the court may grant summary judgment *sua sponte* so long as the adverse party receives adequate notice and a reasonable time to respond.  Fed.R.Civ.P. 56(f); *Stingley v. Den Mar Inc.*, 2009 WL 2762374, *3 (5th Cir. Sept. 1, 2009) (unpubl.) (citing *inter alia*, *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 770-71 (5th Cir.2000)).  The instant report and recommendation provides adequate notice to the parties. *McCoy v. Wade*, 2007 WL 1098738, *1 (W.D. La. Mar. 12, 2007) (citing *Magouirk v. Phillips*, 144 F.3d 348, 359 (5th Cir.1998)).

## Conclusion

For the above-assigned reasons, the court finds that there are no genuine issues of material fact and that plaintiff is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56. Accordingly,

**IT IS RECOMMENDED** that the motion for summary judgment [doc. # 28] filed by defendant Life Insurance Company of North America be DENIED.

**IT IS FURTHER RECOMMENDED** that the motion for summary judgment [doc. # 24] filed by plaintiff Alfred Mercer be DENIED, insofar as it seeks to re-visit the standard of review to be applied in this case.

**IT IS FURTHER RECOMMENDED** that the motion for summary judgment [doc. # 24] filed by plaintiff Alfred Mercer otherwise be GRANTED, and that judgment be entered in favor of plaintiff ordering defendant Life Insurance of North America to pay plaintiff long term disability benefits retroactive to his alleged disability onset date of December 17, 2009, through and until the entry of judgment, subject to such elimination period and offsets permitted under the Plan.

**IT IS FURTHER RECOMMENDED** that the court order defendant Life Insurance of North America to continue to make long term disability benefit payments, from the date of entry of this judgment in the monthly amount specified in the Plan, subject to such offsets as are permitted in the Plan, until such time, if there comes such a time, that Life Insurance of North America makes an adverse determination, *consistent with ERISA and the Plan terms*, that plaintiff is no longer entitled to benefits.

**IT IS FURTHER RECOMMENDED** that attorney's fees be awarded in favor of plaintiff in an amount to be jointly stipulated by the parties, or via contested motion, if, despite *all reasonable and diligent efforts*, the parties remain unable to agree upon a reasonable figure.

**IT IS FURTHER RECOMMENDED** that defendant bear all assessable court costs.[17]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.C.P. Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 21st  day of May 2012.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE

---

[17]  Plaintiff did not request an award for interest.